Our next case for argument is 2023-2100, Dinh v. United States. Mr. Marzulla, please proceed. Thank you and good morning, Your Honor. If hypothetically Congress were to pass a statute that canceled the cofina bonds in question and seized the $600 million that was held in trust, transferred it to the General Treasury of Puerto Rico without compensating the bondholders at all, I think we'd agree that that would be a taking under the Fifth Amendment requiring just compensation. The issue in this case is whether it makes a difference that Congress, instead of doing that, chose to create an entity, the Oversight Board, and a process, the Title III Court, and accomplish effectively the same thing. Can Congress, in short, do indirectly what it cannot do directly to circumvent the requirements of the Fifth Amendment? Counsel, let me ask you a question. Haven't the real underlying substantive disputes here been litigated before an Article III district judge from the Southern District of New York appealed and affirmed to the First Circuit and then the Supreme Court's denied cert? I mean, hasn't this all been through the process? Why have these questions really not already been asked and answered? Or is this some kind of hail Mary after losing at the district court, the circuit court, and then getting rebuffed at the Supreme Court? Well, first of all, the Supreme Court didn't grant cert, Your Honor. And the First Circuit found that there was a mootness by estoppel. That was a new one on me. But because the process had proceeded, because everything had- You lost at the First Circuit. We lost at the First Circuit not on the merits, but on the procedural ground that the monies had already been transferred and that there was reliance on that. So the First Circuit never reached the merits. The Title III court did look at the question of whether Puerto Rico or the oversight- You mean the Article III district judge? I'm sorry? You said the Title III court? Yes. You mean the Article III judge from the Southern District? Or what are you talking about? Oh, no, Your Honor. PROMESA provides for the establishment, under Title III of PROMESA- Okay, I understand. provides for the establishment of a court appointed by the Chief Judge- On stage arrest.  To the Marines. So that process was a very limited process. It was not a litigation, did not involve the United States. And yes, you are entirely correct that some of the parties did raise the issue of, is this a taking? However, that court did not have jurisdiction similar to the Tucker Act. The United States was not a party. So I would say, no, the issue has not yet been litigated. The trial judge did a pretty good job with most of the issues before him on this motion to dismiss. He found that he had jurisdiction. He found that statute of limitations hadn't run, that the plaintiffs had a compensable property right. But he slipped on the ice, if I could use that term today, in choosing the wrong test for takings. That is, he looked at the test that this court prescribed on a very different factual situation in A&D Auto. And that test was whether the party had been coerced or was acting as an agent of the United States in performing the actions claimed to be taken. Why doesn't that rule apply here? I'm having a hard time appreciating that. I know you're going to get to it. But why wouldn't the A&D Auto sales rule apply? Yes. Go ahead. Factually, Your Honor, A&D Auto involved the question of whether a government-offered loan to a private party, Chrysler, could still constitute a taking because of certain conditions attached to it by the government. And that's why the court came out with saying, well, if you can prove that Chrysler was coerced, or if you can prove that Chrysler was acting as an agent of the United States, then you may have a taking. In this situation, what we have, of course, is an oversight board created by Congress, the members of which are appointed by the president. They operate above and beyond the authority of the territorial government of Puerto Rico. They have independent discretion, right, to take action, right? They have. Why? I'm still not understanding, other than that there's factual differences, why the test of A&D Auto sales wouldn't apply. I mean, A&D Auto went through multiple pages of talking about, here are circumstances in which, even though it wasn't the government that was the direct actor, the government still could be held accountable. And here's these examples, and one of them was where there was coercion, one of them was where there's an agency relationship. I just, I'm having a hard time understanding why that's not a reasonable test to also apply here, notwithstanding the factual differences. I don't think A&D was saying, this is the test you apply in the particular facts of this case only. And the difference, Your Honor, I think it comes down to the word authorization. This Court has held in cases like Hendler, where the government authorized state agents to come on plaintiff's property. In Purcell, the early Rails to Trails case, in which the government authorized the town of Burlington to create a hiking trail over the plaintiff's property, that where the government authorizes, where the Congress authorizes a third party to take private property without just compensation, that that too is a taken, and A&D Auto just didn't involve that. Congress authorized them to create an oversight board, and then from that point it was up to the oversight board to decide what actions were necessary. What actions were necessary, Your Honor? I think that's exactly right, to accomplish the congressional purpose. And what was the congressional purpose in the Puerto Rico Oversight Management and Economic Stabilization Act? The congressional purpose was to provide a, quote, federal solution to the economic problems of Puerto Rico. There are statements that the bondholders, not the taxpayers, should be responsible for helping to stabilize the Puerto Rican economy. So the oversight board... That wasn't required. The oversight board, there's nothing in that statute that requires the oversight board to choose to hold the bondholders, you know, liable. Well, clearly, would the oversight board be performing its function? I suppose they could have just said, we're not going to do anything. But then I suspect that they would have been terminated for cause and new board members appointed. That is, there was a very specific purpose here. Congress knew that Puerto Rico had outstanding obligations, both bonds and other debts, that were hindering its economic stability. And one of the specific ways in which Congress sought to address that issue was to restructure the existing debts. Specific discussion, and this is in our complaint by the sponsor of the bill, Mr. Duffy, that without including the COFINA bonds, you would get only about 30 percent of the debt, and that wouldn't do the job. You had to include at least 75 percent of the debt, which is using the COFINA bonds. So you have this extraordinary circumstance. Can I ask you something? Your argument, I think, hinges on your allegation that what happened with the COFINA bonds is the direct intended result of the government action here. Precisely, Your Honor. I think it is a causation issue. And so if we didn't agree with you, that would be the end of your argument, right? Just so I'm just trying to make sure I understand. If you didn't agree with me that it's a causation issue. Or that it's a direct intended result of the government action. Oh, yeah, yes. If you said that PROMESA wasn't intended. I mean, that's what the court below said, right? Yeah. If we affirmed that on that basis, then your argument would be lost. No, I don't think that's what the court below said, Your Honor. I think the court below looked at that narrow test, coercion or agent of the United States. And said, you're neither of those. Therefore, it's not a taking. And what he overlooked was that if Congress has authorized a third party to do the taking, Congress doesn't have to coerce them. And they don't have to be an agent of the United States. They can still be constituting a taking. That is, Congress can't simply say to someone, I'm not going to take the property. I'll tell Joe Smith to go take the property. And then I'm off the hook. This was done for a public use, just like other public actions. And that, of course, is a requirement of the Fifth Amendment as well. So we have myriad cases. The government says, oh, this is only limited to real property cases. Well, this court and the Supreme Court have found legislative takings in cases like Sienega Gardens, where Congress altered the relationship between the mortgagor and the mortgagee. The same thing with the Depression-era foreclosure statute, which prohibited the mortgagor from foreclosing. Recently, the Supreme Court, in the Cedar Point nursery case, held that a regulation, it wasn't a statute, it was a California regulation, that allowed labor organizers to come on the property without permission, was a taking. Again, the action was by the third party. It was simply the authorization of that action that constituted taking. Let me ask you a question. So far, I haven't heard anything about your jurisdictional argument. Are you conceding the jurisdictional argument here? The trial court found there was jurisdiction, Your Honor, and I think correctly so. As you know, the rule is that jurisdiction in a case like this, in a taking case under the Tucker Act, seeking money damages under a provision of the Constitution, is presumed to be within the jurisdiction of the court of federal claims, and only if there is a clear revocation of that jurisdiction do we find that the court is deprived of Tucker Act jurisdiction. I think that the trial court got that one entirely correct. If it's okay, I just want to ask you one last question, and then we'll save the rest of your time for rebuttal, which is just, so my problem is you want us to look at the direct intended result of government action test, and you don't want, and you think the court of federal claims erred to the extent that it required coercion or agent of the United States, which comes from our A&D decision. I just don't see how I get around our A&D decision. I mean, what is your best argument for why that A&D decision doesn't apply, or is your argument that our A&D decision is inconsistent with regional circuits, which allowed for takings to be found in broader circumstances than what we required in A&D? Yeah. What I'm saying, Your Honor, is that A&D was correct in its circumstances. It wouldn't apply, let's say, in a flooding case. Would you say that if the government- Let's just agree that water is just different. Okay, water is different. Let's just leave water off on the side, because everything about water is different.  So, go ahead, tell me something else. So how about the taking of money? I'm thinking here of Webb's Fabulous Pharmacy, those interest cases. How about Loretta, a case in which New York had a statute that said cable companies can come install cable on your property. Again, there was no coercion. There was no requirement that cable companies install cable. So then why is A&D correct? Why isn't your argument that our decision in A&D needs to be overruled? Now, because in A&D, there wasn't any question of government authorizing any action by Chrysler. That simply wasn't the factual circumstance. So there are different factual circumstances where a taking can occur. So A&D was simply the wrong choice for this fact pattern. Just as flood may have a certain fact pattern, water rights takings may have a different fact pattern, and they're looked at differently. What we do know, what you'd have to do to confirm, to affirm what the trial court found, was to say that Hendler was wrongly decided. Because nobody coerced the state of California to come on Hendler's property. Purcell was wrongly decided because nobody coerced the town of Burlington to build a hiking path on Purcell's property. That is, that's simply a different set of facts that also constitutes a taking. And we do have these cases like the interest cases I mentioned. Webb's Fabulous Pharmacy, holding that the interest on a deposit with the court belonged to the party that deposited the money, or the parties that were entitled to the money. And a statute requiring that that money be sent elsewhere was a taking. Okay, we've used all your time and all your rebuttal time, and more than that. I'm going to restore your rebuttal time, but let's go ahead and hear from the court. I appreciate that. Thank you, Your Honor. Absolutely. Thank you, Your Honor. May it please the court. I can address the jurisdictional argument first, if you would like, where I could get right into the merits of, I think, what most of the colloquy here was. I mean, A&D is the correct test to apply here. It's not just been applied in A&D. If you look at cases following it, Welty is a case that we cited in our brief. Within the past year, Great Northern Properties was another case where you have a third party. The allegation is instigation of that third party's government action by the federal government, including Congress. What about the argument that this is an authorization case, that Congress authorized action, and so, therefore, that's why it's different than A&D? Sure. A few points about that. All of the cases that were cited in the trial court evaluated those cases. If we talk about Cedar Point, Loretto, there is a direct – what we're talking about there is direct – on the face of the statute, there is a taking. The Supreme Court found that on the face of the statute at issue in Cedar Point, it essentially created a physical easement. Same thing in Loretto. Handler involved a direct order from the federal government, essentially an order that allowed states – allowed state officials to go onto property in the first instance. That's direct and intended. What we have here is a broad, generalized statute. And I want to address a couple of things on that, because unlike in these other cases where there's a direct government action that the legislature is imposing, that in and of itself imposes a taking, in those cases physical takings, here we have a statute that incorporates all sorts of provisions of the bankruptcy code. And so there's no requirement – essentially, the conclusion that the Title III court reached in the First Circuit affirmed was not inevitable. It was not required. It was not commanded. It was not ordered. And you can see that even when you look at the complaint in this case. Plaintiffs are essentially saying, here, we have secure debt. We have special revenue debt. And as we set forth in our briefing, PROMESA in Section 2161 incorporates many, many provisions of the municipal bankruptcy law. So essentially, all of those provisions that protect special revenue have been incorporated into PROMESA. It also has – there's also provisions with respect to an automatic stay, where a litigant can essentially go and try to get adequate protection for their property interest through that process. All of those come in through Chapter 9, from the Chapter 9 municipal bankruptcy law. And so essentially what we have here is plaintiffs sat on their rights. Congress enacted a broad, overall statute. It didn't require anything. It provided discretion to the Oversight Board. The Oversight Board had to make numerous discretionary decisions. Plaintiffs did not file to seek to essentially get relief from the automatic stay. Plenty of litigants did. If you compare the Alter case, which was in the Court of Federal Claims, they went and tried to get relief from the automatic stay and got relief from the automatic stay. So all of these are steps that plaintiffs could have taken. But what we're looking at here is we have a third party taking all of these discretionary actions. And when we're talking about a legislative takings claim, you have to look at the statute. What does the statute say? And there's no coercion and there's no agency. And we know this because the trial court found that plaintiff conceded those below. And they've conceded them in the opening brief here. Can I make sure I understand? You're saying there's no direct intended and intended result because there's so many options that the Oversight Board had in dealing with the situation. Is that a summary of it, like so many different actions? There's so many discretionary actions, but also you have to look at the provisions of PROMESA. So not only are there these various options, if what plaintiffs are claiming, which they do claim, is they have this specific type of debt. And they claim that about five or six places in the complaint in their briefing. PROMESA incorporated the protections from the municipal bankruptcy law into PROMESA. And so plaintiffs could have gone and tried to essentially use those provisions to achieve a situation where they got 100 percent recovery on their debt. So if you think about a situation here, let's just say that plaintiffs, you know, hypothetically their debt was 100 percent protected. Everyone agreed to that. But PROMESA said you had to file a claim. And plaintiffs just never filed a claim. Would that be a legislative taking by Congress because they didn't take any of these steps even though they could? One place I'm struggling is where the line is between maybe authorization on the one hand versus coercion and agency on the other. I'm having trouble, you know, putting these cases all nicely into two discrete buckets. One that sort of honors A and D and the notion that there has to be coercion or something. And then others which say, you know, if the government expressly authorized a taking, that that is sufficient. So where is that line? How do I put those two buckets clearly apart? And by the way, nothing's ever clear in taking. Sure, Your Honor. And I recognize that. But I think A and D sets out the general standard. And for the most part, for third-party action, you have to show coercion. You have to show agency. There are a limited number of cases which we've talked about here where essentially on its face, Congress is essentially or the federal government is commanding, requiring something. That in and of itself is a taking. So that's a little bit different than sort of the sort of A and D model. But it's all getting to the same point. It just means that they weren't requiring something. I mean, like in Loretto, they authorized it. They didn't require it. They didn't say, you must go on their land. But on its face, the statue in Loretto was a taking and there was nothing else. Because the direct and intended consequence was that essentially there was a physical easement on anyone's property who was going to get the cable wire. So all of these cases are direct and intended cases that have been put forth. And for the reason I just talked about, there's nothing direct and intended about incorporating in into PROMESA all of these various steps. Having what plaintiffs have essentially conceded is a third party here, the oversight board, taking all of these various steps. And then plaintiff not coming in and essentially exercising its rights as other parties did. So there is- Well, I think that one of their arguments, and I mean, I guess I could be wrong, but I understand their argument to me that there wasn't anything the oversight board could really do other than this. Like that this is the only way they could really capture a sufficient amount of the debt to do the restructuring. But respectfully, on the one hand, so the argument is completely inconsistent. Because they say they have special revenue debt. And under the code provisions that have been applied, 552, for example, would not apply for special revenues coming in going forward. And so if that is the case, then their naked allegations that this debt was targeted cannot be true. Why did the Court of Federal Claims assume they were? Assume- And then went on with their analysis. Well, I think he was specifically applying A and D and getting towards sort of what was direct and intended. I think when he evaluated these other cases, including Cedar Point and whatnot, I think he's getting towards the same point, which is those are physical takings cases, which essentially on their face are direct and intended because there's a taking on its face. So I'm not, you know, the exact- I think where he's coming from is exactly applying the A and D framework when we have a third party action, which is what we have here. But you think to the extent that he said, I accept for purposes of this order, that this was the direct and intended effect? Or, you know, that that's probably not right? Well, I don't think that it could possibly be right that the direct and intended- when you look at the statute on its face, which is what you have to do when you look at Cedar Point, what the Supreme Court is doing is they didn't have- they didn't look at whether there was a trial as to whether or not union organizers went onto a property a set number of days. They looked at the statute on the face and whether that was direct and intended. It was direct and intended because on its face, that created a physical easement for those union organizers to go to the property. As complicated as takings law is, this set of cases actually goes well together. Because as this court has said a number of times, the Supreme Court has said, there's generally not takings liability for the federal government for Congress when you just have a general statute. I mean, it itself says that. Suppose the statute said, in contrast to what it does, it created, you know, PROMESA, it created an oversight board, and suppose it's expressly said, and the oversight board is authorized to do- to basically devalue the junior bondholders' value if necessary to achieve the overall restructuring that is required. Suppose the statute expressly said that, that the oversight board doesn't have to do it, but they are authorized to do so in order to effectuate the necessary restructuring. Well, it's obviously a contrafactual because it's going through and removing 552, 922, 928. But setting all of that aside, I mean, it could be- it's potentially a different case. I mean, we don't think it's a- we don't think it's a- We understand that it doesn't have that on- in the rule, but what is your answer to the hypothetical? I mean, I think we would have to see what it says. If, for example, the statute said, we're going to, you know, we'd have to eliminate all of the junior bondholders, it made it essentially inevitable, there was no discretion by this third party to actually do this. What if it just authorized them to do it? Authorized them to do what, Your Honor? To devalue these particular bonds. Well, again- Expressly on its face. Well, I think potentially that's a different case, but here we have, you know, all sorts of provisions- Would you have an answer to the hypothetical? Just assuming that was the case in front of us, what would you say? Well, I would like to see the exact language of what it's saying because we have PROMESA. We have- I mean, if you look at 2161, it incorporates like over a hundred- I think over a hundred provisions that all have to be evaluated when you're looking at whether or not something is direct and intended. And so if the statute said, you know, the oversight board has to eliminate junior bondholders or get to a certain number, but here they don't have to get to a certain number. And part of the reason why we know this- You didn't when you said if. And then if you're hypothetical, yeah. What language do you think would cause this to be a direct and intended result? Well, if it was directed, for example, at the COFINA bond, if it said that there had to be a certain percentage of a recovery, because here what we have is there can be a hundred percent recovery. And part of the reason why we know this is plaintiffs submitted a 28J letter that talked about a First Circuit decision involving PREPA, which is another instrumentality of Puerto Rico, within the last 10 days. And that essentially- the First Circuit basically was saying that some of that- some of those are special revenues. Some of that has to be protected. And essentially they can't get a haircut. So none of this was inevitable. So my problem is, Loretto, they authorized the cable companies to go out on property, but they didn't say go to this property and take this. They authorized them to do so as necessary. That's it. Like it wasn't, I want you to go here and put your box here, or do here and go here. They weren't expressly authorized to take property from particular individuals. Likewise here, this oversight board was authorized to restructure the debt in Puerto Rico. So it's not that they earmarked particular individuals who would have to be the ones who lost out, you know, but it gave them the authority to do that. But, Your Honor, restructured with certain statutory guideposts that have to be followed. And that's the difference. Again, all of those provisions are incorporated into PROMESA from Chapter 9 of the Municipal Bankruptcy Law. So there's all sorts of rights that plaintiffs had here. And, again, if we're talking about special revenue debt, that was- again, that's why they didn't just incorporate those Chapter 9 provisions. But those are incorporated in whole here. So Loretto is one for one. On its face, it's a physical taking. And in that case, there may not be just compensation at all because what is the harm essentially- But that's why I'm wondering. That's why I got you, I get, on its face, a physical taking. That's why I'm wondering if this case, expressly authorized, if the statute says you may turn to the cofina bonds and devalue the junior bondholders if necessary to achieve the restructuring, you know, identified herein. They don't have to do it that way. They have the discretion to choose if they can find a different way to do it. They can, but if Congress went so far as to narrowly give them this exact example of how they are, in fact, authorized to proceed to effectuate restructuring, I don't know what to do with that. What exact example? Are you talking about something other than the language of the statute? Or are you talking about- Yes, of course. I'm saying suppose that the statute itself expressly told the oversight board it had permission to take the exact actions that were taken here if necessary to do the debt restructuring that's required overall. Well, I mean, I guess if it said that these were otherwise protected and the oversight board is authorized to go and do that, but again, that's so far away from what happened. That would be certainly a different situation here. I think it's still more attenuated than any of the direct statutory examples that we've talked about where there's- I get it. All right. I got it. Anything else? Well, I'm- He went over, so I'll let you go. I'm sort of happy to address the jurisdictional argument really quick. I mean, our argument there is just on the face of the statute, claims have to be brought into district court because this taking lawsuit constitutes, quote, any action. It arises at least in part under PROMESA, and we think that those would have to be channeled. Congress has intended for those to be channeled to district court. We think that other provisions, 2150 of the statute supports that, where Congress said they did not want to essentially be on the hook for paying any money with respect to the principal and interest on the bonds. We also think that within the Title III process, a plan could not be confirmed if it violated the law, and so the Title III court even evaluated takings claims in that situation. And when you look at really what it comes down to, what property we have here, what we have here is principal and interest. And so if the Title III court were to find that by essentially, for example, getting rid of this, what plaintiffs are saying is secure debt, if that was a taking, the end result would be that they would get the full principal and interest on the bonds. And so we think that there's avenues for plaintiffs to have taken, and we think that that's really what Congress intended for these claims. And that matches with just the situation on the ground, where— I know, but even the language that you just used, we think that's what Congress really intended with these claims. Inherent in exactly the language you just chose is a lack of express. We think that's what Congress really intended. It has to be expressed. The way you just argued it was the best acknowledgement I could have gotten that it wasn't expressed, because you didn't even say it was expressed. You used squish language. And that's okay, but I'm just telling you why I also don't think it's expressed. Well, we don't think that the language in 2126 is squish. We think that you can't read that to sort of carve out takings claims, just on its face. And that makes it different from the cases, the various cases like Pursault. It makes a difference from Ruckelshaus. It makes a difference from all of the situations where the government has pointed to language where essentially channeling— To be clear, I think the language could be construed the way you want. I just don't find it to be expressed. And the case law says to take away tough characteristics, it has to be expressed. Well, again, I think on its face, I don't think the trial court actually went through and parsed the specific language of what constitutes any action, what constitutes arising under, at least in part. Arising under, at least in part, I'm not sure what meaning that could possibly have if there could only be essentially one, essentially substantive law that a claim could arise under. Okay, I think we have your argument. I thank you. And Mr. Mrosoloff, you have some rebuttal time. Thank you, Your Honor. Thank you, Your Honor. And I really want to make, I think, just two points. First of all, this case is here on a motion to dismiss, in which the facts of the complaint are assumed to be true. I think we've gotten well beyond the allegations of the complaint. The complaint certainly alleges that Congress adopted PROMESA for the purposes we've described and that it was a direct and intended result of Congress that this statute, which it was passed by Congress for the purpose of restructuring debt of Puerto Rico, was, in fact, that the direct and intended result was that at least debts like COFINA's, COFINA was specifically mentioned, and we've alleged this in our complaint, specifically mentioned during the debate. We need to have the COFINA debts in this process. Now, let's talk about PROMESA for just a moment. Counsel would like you to think, perhaps leave you with the thought that, oh, this is just a bankruptcy statute. It is not. First of all, it does not require that any of the entities, like COFINA, be insolvent, because COFINA was not insolvent. It was paying its debts up to the day the statute was passed, and it had $600 million in a trust fund, which was sufficient to pay off the principal and interest of these bonds as they arose. What Congress created in PROMESA was a process whereby the oversight board was tasked with going out to certify, that's the term used, territorial instrumentalities. Remember, it's the territory of the United States. The statute was passed under Congress's authority over territories and property of the United States. It's a regulation of property of the United States, that the oversight board was tasked with going out and restructuring existing debts. COFINA was discussed during the congressional debates, and the oversight committee Your time is up, and you're repeating yourself, so we're going to call it a day. Very good, Your Honor. I would just ask, then, that you look at the provisions of PROMESA by which COFINA does not file. It's filed by the oversight board without COFINA's authorization. Okay, thank you very much. Thank you, Your Honor. I thank both counsel. This case is taken under submission.